UNITED STATES DISTRICT COURT
WETERN DISTRICT OF NEW YORK

———————————————————————————————

TAMARA COLE,

                                  Plaintiff,

                                                        Case No. 13-CV-6258-FPG

v.

                                                        DECISION & ORDER

CAROLYN W. COLVIN,
Acting Commissioner of Social Security
Administration of the United States,

                                  Defendant.

———————————————————————————————

## I.      INTRODUCTION

Plaintiff Tamara Cole ("Plaintiff") brings this action pursuant to Title II and Title XVI of the Social Security Act ("SSA"), seeking review of the final decision of the Commissioner of Social Security ("Commissioner"), which denied her application for disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF No. 1. The Court has jurisdiction over this matter under 42 U.S.C. §§ 405(g) and 1383(c)(3).

Before the Court, currently, are the Motions for Judgment on the Pleadings filed by both parties pursuant to Federal Rules of Civil Procedure 12(c). ECF Nos. 15, 16. For the reasons set forth herein below, I find that the final decision of the Commissioner is supported by substantial evidence within the record[1] and accords with applicable legal standards. Therefore, this Court grants the Commissioner's Motion for Judgment on the Pleadings, denies Plaintiff's Motion for Judgment on the Pleadings, and orders that the Complaint be dismissed.

———————————————————

[1] All references to the Administrative Record are reflected herein as ("R."), along with the associated page number(s).

## II.    BACKGROUND

### A.  Procedural History

Plaintiff protectively applied for a period of disability and DIB on September 27, 2010, and, on that same date, protectively applied for SSI, alleging in both applications disability beginning July 15, 2009.  R. 167-78.  Her applications for disability and DIB and SSI benefits were denied on March 4, 2011.  R. 25.  On May 22, 2012, Plaintiff, represented by her attorney Stephen A. Segar, Esq., appeared and testified at a video administrative hearing held before Administrative Law Judge ("ALJ") David J. Begley.  R. 43-79.  Vocational Expert Martin A. Kranit, ("VE") appeared by telephone and testified, as well.  *Id.*  At the conclusion of the hearing, the ALJ held the record open for submission of additional evidence.  R. 25, 78.  Such evidence was received and entered into evidence.  R. 25, 182-83, 368-69.  Thereafter, by letter dated June 12, 2012, Plaintiff's representative, with her permission, amended the onset date to August 31, 2011, based on Plaintiff's earnings records for the years 2010 and 2011.  R. 249.  The ALJ on June 15, 2012, issued an unfavorable decision finding that Plaintiff was not disabled.  R. 34.  The ALJ's decision became the final decision of the Commissioner on March 18, 2013 when the Appeals Council declined to assume jurisdiction.  R. 2-5.  Thereafter, Plaintiff timely commenced this civil action in the United States District Court for the Western District of New York, appealing the Commissioner's decision.  ECF No. 1.

### B.  Factual Background

Born in 1987, Plaintiff was 24 years old at the time of the administrative hearing, and had graduated high school and completed two semesters of college, studying criminal justice and nursing.  R. 49, 58.  She initially testified that she last worked on July 15, 2009; her employment history included work in telephone sales; as a cashier at a fast-food restaurant, from which she

claimed that she was fired in 2010 due to anger problems due to depression and left hand pain; and self-employment in 2011 assisting a friend with a hair dressing business, but stopped due to hand pain. R. 50-54. Plaintiff testified that she could not work because of depression and left hand pain. R. 52, 73. The pain in her left hand caused her to get depressed. R. 51, 52.

Plaintiff lived in a 17th floor apartment with her nine-year-old son, custody of whom she had lost, but hoped to regain legal custody soon. R 56-57. She stated that her driver's license had been taken away in 2009 due to a DWI in 2008, and that she took the bus to the hearing. R. 57-58, 69.

She stated that due to neglect as a child, she experienced post-traumatic stress and recently started taking Seroquel and Abilify for her mental health issues and was taking them as prescribed. R. 52, 60, 66. Plaintiff testified that she was hospitalized in February 2012 for two weeks  because she ran out of her medication; she got depressed and called an ambulance to come to get her. R. 66. She was seeing a therapist at Unity Health's Evelyn Brandon Health Center. R. 59-60. The medications helped her to function enough to take care of her son, but did not make her happy. R. 65-66. She stated that she sometimes hallucinated or heard voices as side effects of the medication. R. 67. She had taken Advil in the past, but now took prescribed medication for her left hand and, for the last two years, sometimes wore a brace. R. 60-61. When she was young she cut her hand when it went through a window. R. 61. Lifting anything heavier than five to ten pounds or doing housework caused her left hand to hurt; she could lift more with her right hand, but was depressed about her left hand. R. 61, 63.

Plaintiff testified that on a typical day, she awoke at 7:00 a.m.; put her son on the bus; tried to clean up as much as possible; tried to make something to eat using her right hand; washed up; and maybe read a book or went for a walk. R. 64. She was able to dress and bathe herself using her right hand. R. 65. She, primarily, did the household chores, shopped for

3

groceries, washed the dishes, and did laundry, although she sometimes dropped it.  R. 64, 65. She stated that she did not watch TV, do puzzles or games because of depression and anxiety; sometimes woke up in the middle of the night with nightmares about her childhood.  R. 65. Plaintiff went to church once a week, but planned to go once or twice a month; played kick ball with her son and attended his school events.  R. 68-69.  They read together.  R. 68.  Regarding alcohol, Plaintiff testified that she had not drunk since 2009, except for an occasional wine cooler, and never used illegal drugs.  R. 69-70.

On examination by her attorney, Plaintiff testified that she sometimes experienced numbness in her left hand when she was grocery shopping or cleaning, dependent upon her weekly schedule; the numbness lasted for hours sometimes and caused her to drop things; her left hand felt "useless."  R. 70-71.  She gets really nervous around people, she might get angry and break down and cry.  R. 70.  On medication, she was able to be more stable; medication stabilized her mood and helped her.  R. 72.

The VE, who appeared at the ALJ's request for the purpose of determining the extent to which Plaintiff's additional limitations impeded the unskilled light occupational base, testified that an assumed individual with Plaintiff's age, education, work experience, and able to do a full range of light work, limited to: only occasional pushing and pulling with dominant left hand, occasional handling and fingering with the dominant left hand, work requiring only simple, routine, repetitive tasks, occasional interaction with co-workers, as well as the general public, could perform work in light, unskilled jobs.  R. 74-76.  He named three such jobs, providing 25 percent of the total numbers to accommodate work that could be done by a person with a non-dominant right hand: housekeeper with 4,500 jobs in New York State and over 100,000 jobs nationally; sorter with 4,500 jobs in New York State and 50,000 jobs nationally; and mail clerk with 2,500 jobs in New York State and 30,000 jobs nationally.  R. 75-76.  The VE also testified

that if such individual was off task 20 percent of the day, he or she would not be able to maintain full time competitive employment. R. 76. Upon questioning by Plaintiff's attorney, the VE stated that there would be no work for such person if he or she also missed three to four days a month. R. 76-77.

### C. Relevant Medical Evidence

When Plaintiff was examined on February 9, 2010 by MSPT Sancilio at Southview Physical Therapy and Sports Rehabilitation, P.C. ("Southview"), she reported that she was experiencing pain, numbness, and decreased functioning of her left wrist and hand due to an injury sustained around 1997. R. 251. On objective examination, palpation was positive for tenderness; passive range of motion in the wrist and thumb were within normal limits, but strengthening of her left shoulder and hand was indicated. *Id.* The assessment was loss of strength, decreased function, thenar atrophy and pain limiting function of the left hand. *Id.*

The record evidence demonstrates that Plaintiff received her routine primary care through Westside Health Services' Brown Square Center located at 322 Lake Avenue, Rochester, New York ("Westside") where, according to progress notes, she was treated for medical and mental health concerns in 2010, 2011, and 2012. R. 257-272, 351-67. On September 1, 2010, Plaintiff went in to discuss her mental health and was diagnosed with PTSD and agoraphobia without panic based on reporting a history of pervasive emotional stress/anxiety; rape in 2008 by an unknown male who she fought—felt her anxiety increased since then; a difficult childhood due to neglect; nervous around people; symptoms of shaking, inability to look at others' eyes and mostly staying home which interfered with work; success in an office job, but left when she could not participate in trainings and meetings; racing thoughts calmed by cleaning; difficulty sleeping; and recurring thoughts and nightmares about rape. R. 267-268. She had not sought treatment for mental health, but was motivated for treatment now "to go back to school, have a

job, [and] be the best mom for her son." R. 268. She wished that she could disappear; but unlike eight years ago, presently, she had no suicidal thoughts or plans. She was started on Sertraline. R. 267-68.

On September 2, 2010, Plaintiff was seen at Westside for medical concerns and depression, reporting that on Zoloft she was cleaning her house a great deal "to self-sooth[e]"; had a history of suicidal ideation, but denied any present suicidal ideation; and was hearing music and knocks at the door that were not there. R. 264. Dr. Scott R. Dent did not see present signs of mania, but stated that Plaintiff should be watched closely for this; he assessed Plaintiff with major depression, a single episode, unspecified; continued her on Sertraline; and signed a form to keep her out of work for three months. R. 264-265.

At the Westside visit on September 8, 2010, Plaintiff reported that she stopped taking Sertraline which increased her depression; upon examination, she did not appear depressed and her affect was normal. R. 262. She was assessed with atypical depressive disorder and started on Lamotrigine; she agreed to counseling. *Id.*

At a visit to Westside on December 6, 2010, Plaintiff reported that she had stopped taking Sertraline due to side effects of hearing music and sleeplessness; now, she felt stable and had no concerns with sleep, sadness, or tearfulness, and had no episodes of increased energy or agitation. R. 257. She was assessed with an atypical depressive disorder and referred to the Evelyn Brandon Health Center for depression with episodes of agitation and audio hallucinations. R. 258.

On February 14, 2011, during Plaintiff's Westside visit, she sought a referral to a neurologist for the muscle loss in her hand and that it would help establish her case for SSI; she also had stopped taking Sertraline stating, it made her "feel worse." PA Terri Ragin referred Plaintiff to the Strong Neurology Department. R. 357-58. A May 17, 2011 nerve conduction

test of the left wrist conducted at the University of Rochester Medical Center showed evidence of median neuropathy with complete denervation of the left abducto-pollici brevis, but no evidence of left ulnar neuropathy. R. 368-369. Dr. Anne Corbett saw Plaintiff at Westside on February 9, 2012 for a medication review, noting that Plaintiff had a "right" hand injury in 1997. R. 351.

Plaintiff was also seen as an outpatient for mental health concerns at Unity Health Systems' Evelyn Brandon Health Center ("Unity"), with an initial mental health evaluation on December 28, 2010. R. 273-78. She was diagnosed with PTSD, major depressive disorder, recurrent, severe with psychotic features, anxiety disorder not otherwise specified, and possible social phobia. R. 273. Plaintiff reported that she had stopped taking the psychotropic medication prescribed by her primary care provider − it caused her to hear voices and music in her head; she could not sleep, cried frequently and saw white lights and white shadows. R. 273-274. She was logical and coherent, alert, oriented times three, and had good insight, but her mood was anxious and depressed and her thought process was remarkable for helplessness, hopelessness, and worthlessness. R. 276.

At the Commissioner's request, Dr. Kavitha Finnity, a psychologist, conducted a consultative psychiatric evaluation of Plaintiff on February 14, 2011, and diagnosed mood disorder with psychotic features and PTSD, opining in her medical source statement that Plaintiff could follow and understand simple directions, perform simple tasks, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks with supervision, and make appropriate decisions. R. 279-81. She noted that Plaintiff was having difficulty dealing with others and dealing with stress. R. 281. Dr. Finnity based her findings on Plaintiff's reports and her observations of Plaintiff during the mental status examination. Plaintiff reported the following: no psychiatric hospitalizations; difficulty sleeping and loss of

appetite; depressive symptoms including dysphoric mood, crying, hopelessness, and irritability; loss of interest and energy, and social withdrawal; excessive anxiety with nightmares and flashbacks about five times per week; increased energy and goal-directed activity; and auditory hallucinations. R. 279. Plaintiff stated that she abused alcohol from age 21 until 22 and last worked in December of 2010. R. 280. Plaintiff could dress, bathe and groom herself, cook, clean, do laundry, manage her money, enjoyed reading, but did not socialize with friends and had a poor family relationship. R. 281.

During the mental status examination, Dr. Finnity observed that Plaintiff was cooperative, her manner of relating was adequate, and eye contact was appropriate. R. 280-81. Her gait, posture, and motor behavior were all normal. *Id.* Plaintiff's speech was fluent, voice quality was clear, both expressive and receptive language skills were adequate, her thinking was coherent and goal-oriented, and though her affect was flat and her mood was dysthymic, her sensorium was clear and she was oriented to person, place, and time. R. 280. Plaintiff's attention and concentration, as evidenced by doing serial threes accurately, were intact. *Id.* Dr. Finnity also determined that Plaintiff's recent and remote memory were mildly impaired. R. 281. Regarding Plaintiff's cognitive functioning, Dr. Finnity estimated it to be average and that her fund of information was appropriate to her experience, and her insight and judgment were fair. *Id.*

Also on February 14, 2011, Dr. Robi Rosenfeld performed a consultative orthopedic examination of Plaintiff at the Commissioner's request. R. 283-286. Plaintiff's chief complaints were left wrist and arm pain and left foot and leg pain. R. 283. She explained that in 1997 she cut her wrist falling through a window and underwent surgical repair of the tendons. *Id.* She had a cast on for about a month and went to physical therapy, but stopped prematurely. *Id.* She described pain ranging from 2 to 9 on a scale of 1 to 10, depending on the circumstances, stating

that the pain increased with use of her left hand, but that she did not take any medications. *Id.* Plaintiff reported a history of bipolar and depression and that she was taking Sertraline. R. 284. She reported that she did not use alcohol; had no history of drug use; and engaged in daily activities, including cooking, cleaning, laundry, shopping, childcare, showering, bathing, dressing herself, and reading in her spare time. *Id.*

Upon a physical examination, Dr. Rosenfeld, noted that Plaintiff was 5'5" and weighed 131 pounds; she appeared in no acute distress; her gait was normal, she could walk on her heels and toes without difficulty, squat fully, station normally, and used no assistive devices. *Id.* Additionally, Plaintiff needed no help changing for the examination or getting on and off the examination table, and was able to rise from a chair without difficulty. *Id.* Hand and finger dexterity were intact, and grip strength on the left was 4/5 and the right was 5/5. *Id.* She could zip, button, and tie, but could not lift heavy items with her left wrist. *Id.* Her cervical spine showed full flexion, extension, lateral flexion bilaterally, and rotary movement bilaterally, with no cervical or paracervical pain or spasm and no trigger points. R. 285. Examination of the upper extremities revealed full range of motion of the elbows, forearms, wrists, and finger, bilaterally, with an obvious scar on the left wrist. *Id.* No abnormalities were observed in the thoracic and lumbar spines. *Id.* Upon examination, the lower extremities showed a full range of motion of hips, knees, and ankles, bilaterally, with full 5/5 bilateral muscle strength, full and equal reflexes, and no sensory abnormality or inflammation, muscle atrophy, joint effusion, or instability. *Id.*

Dr. Rosenfeld diagnosed left wrist and arm pain, left foot pain, and bipolar depression. He opined in his medical source statement that Plaintiff had mild-to-moderate restriction in lifting and carrying with her left arm, as well as reaching with her left arm, due to left wrist involvement and pain in the left arm. R. 285-286.

9

On February 24, 2011, Dr. R. Nobel, a state agency psychiatrist, reviewed Plaintiff's records using the Psychiatric Review Technique form and determined that Plaintiff did not meet or equal the criteria of an impairment listed in 20. C.F.R. Part 404, Subpart P, Appendix 1.  R. 298.  Assessing the record evidence, Dr. Nobel determined that Plaintiff was not significantly limited in her ability to: remember locations and work procedures; to understand and remember very short and simple instructions; carry out very short and simple instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; ask simple questions or request assistance; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in work setting; and set realistic goals or make plans independent of others.  R. 301-02.  She assessed Plaintiff as having moderate restrictions in maintaining social functioning and in maintaining concentration and pace, and also found moderate limitations in Plaintiff's ability to: understand and remember detailed instructions; carry out detailed instructions; work in coordination or close proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places.  *Id.*  She opined that Plaintiff's mental impairments were severe, but she retained the ability to perform entry-level work with limited contact with people.  R. 303.

On January 24, 2012, Plaintiff had a therapy session with Unity Social Worker Jamie Lee Watt and received a primary diagnosis of Major Depressive Disorder, Recurrent, Moderate

Severity, and PTSD.  R. 334.  Plaintiff's Global Assessment of Functioning[2] ("GAF") was 60

and she appeared stable at this time, with no reported self/other harming behaviors.  *Id.*

On February 14, 2012, Child Protective Services ("CPS") contacted Ms. Watt to say that

Plaintiff had been taken to "RGH under MHA" for seeing rats in her home, believing there was

lead in her basement, and her apartment was dirty.  R. 333.  Plaintiff informed RGH ED staff that

she had stopped taking her medications.  *Id.*

Plaintiff, following up with Ms. Watt at her therapy appointment at Unity on February

17, 2012, presented with euthymic mood and congruent behavior, and explained the

circumstances of her admission to RGH, stating that: she contacted 311 due to concerns for her

and her son's health; she thought there might be lead in the basement and noticed rats in the

basement where coffee and pop cans were stacked up; she thought her home was messy because

she was in the process of moving, but hadn't found a location yet; she had "fish, rice, and

cornbread" in the house, and accused CPS/police of exaggerating their report in that regard.  R.

329-330.  She felt that she was doing well currently, but expressed concerns about regaining

custody of her son.  R. 330.  She was non-compliant with her medications.  *Id.*  Ms. Watt noted

that Plaintiff was stable, with no reported self/other harming behaviors.  *Id.*  Regarding

Plaintiff's mental status, Ms. Watt observed that she was appropriately attired, displayed

appropriate behavior, was logical and coherent, alert and oriented times three, but her speech was

pressured, her insight was superficial and judgment was fair.  *Id.*  Plaintiff received a primary

diagnosis of major depressive disorder, recurrent, moderate severity, PTSD and psychotic

disorder not otherwise specified.  R. 329.  Her GAF score was 55.  R. 329.

Plaintiff missed her appointments at Unity with Ms. Watt on March 8, 2012 and March

16, 2012.  On April 10, 2012, Plaintiff went to Unity and saw Dr. Alexandra Fotiou who

---

[2] Defendant, citing the American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000), states that a "GAF between 51 and 60 equates to 'moderate symptoms' or 'moderate difficulty in social, occupational, or school functioning.'" ECF No. 16-1, n.1.

conducted a mental health psychiatric evaluation.  R. 338-46.  The treatment note discussed a 2011 admission to Strong where she was discharged on 1 mg daily dose of Risperidone, but stopped taking it, as well as Plaintiff's recent RGH hospitalization, noting that she was markedly psychotic, disorganized, and paranoid at the time she entered the RGH emergency room and thought to be experiencing a first psychotic episode.  R. 339.  Dr. Fotiou observed that Plaintiff could not accurately report the RGH events, and she was a fairly poor historian about these hospitalizations.  *Id.*  She also noted that Plaintiff had been in treatment in 2010/2011, with poor follow through, resulting in her case being closed.  *Id.*

During this appointment, though admitting an irritable mood and being concerned about the return of the voices, Plaintiff denied a depressed mood, having nightmares and flashbacks, hearing voices, auditory or visual hallucinations, said she was sleeping well with Seroquel, and had no current persecutory delusions about her past.  *Id.*  Plaintiff presented as very neatly groomed, cooperative, and mildly irritable; her thoughts were disorganized and difficult to follow; her speech was pressured; she showed paranoid ideation; her thought form was circumstantial, tangential, and vague; her insight was superficial and judgment fair; but she "absolutely" denied auditory or visual hallucinations, did not appear to be responding to internal stimuli, and did not present as manic or depressed.  R. 339, 346.  Dr. Fotiou observed that Plaintiff's PTSD symptoms seemed to be in better control, and she was not as overly psychotic as before.  R. 346.  Dr. Fotiou suspected schizoaffective disorder, and replaced Seroquel with Abilify.  *Id.*  The diagnoses included PTSD, psychotic disorder not otherwise specified, major depressive disorder, recurrent, moderate severity.  R. 338.

On April 13, 2012, Plaintiff, again, met with Unity Social Worker Watt who observed that Plaintiff presented with euthymic mood and congruent affect; she appeared stable, with no reported self/other harming behaviors; her GAF score was 55; she was taking medications, as

prescribed; and was working to regain custody of her son. R. 319. Ms. Watt diagnosed Plaintiff with PTSD and Schizoaffective Disorder. *Id.*

## III.   DISCUSSION

### A.  Scope of Review

On appeal, this Court's role is to determine "if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see also* Title 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive ....").  It is not this Court's function to "determine *de novo* whether the [plaintiff] is disabled." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (citation omitted).  "Substantial evidence means 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Burgess v. Astrue*, 537 F.3d 117, 127-128 (2d Cir. 2008) (citing *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004)) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

### B.  Fed. R. Civ. P. 12(c) Standard

Rule 12(c) permits a party to move for judgment on the pleadings "after the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c).  Thus, in deciding a Rule 12(c) motion, a court employs the same standard applicable to dismissals pursuant to Fed. R. Civ. P. 12(b)(6). *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (quoting *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009) (per curiam)).  A court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *Id.*  To withstand a motion for judgment on the pleadings, a court must determine whether the

"'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* at 161 (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). Thus, granting judgment on the pleadings is only appropriate when, after reviewing the record, the court is convinced that the Plaintiff has failed to set forth a plausible claim for the requested relief based on the evidence presented. *See generally Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

### C.  Standard for Eligibility for DIB and SSI

The SSA provides that an individual shall be considered disabled if he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only upon a demonstration that his or her physical impairment(s) are of such severity as to preclude him or her from not only performing his or her previous work but, considering his or her age, education, and work experience, from engaging in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

In determining whether an individual is disabled, using this definition, the Commissioner must engage in the SSA-created, five-step sequential evaluation process outlined in 20 C.F.R. §§ 404.1520(a) and 416.920(a). The Commissioner must consider, in order: (1) the individual's work activity (20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a)(4)(i)); (2) the medical severity of the impairment(s) and that it meets the duration requirement in §§ 404.1509 and 416.909 (20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii)); (3) the medical severity of the impairment(s) and that it meets or equals the listings criteria in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii)); (4) an assessment of the individual's residual functional capacity and past relevant wok history (20 C.F.R. §§ 404.1520(a)(4)(iv) and

416.920(a)(4)(iv)); and (5) an assessment of the individual's residual functional capacity and age, education, and work experience to see whether he or she can make an adjustment to any other type of work (20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v)).

The required analysis is as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1. If the claimant has a listed impairment, the Commissioner will consider the claimant disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999). The claimant bears the general burden of proving that he or she has a disability at steps one through four of the sequential five-step process, *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004), and only when the claimant proves that he or she cannot return to his or her prior work, at step five, does the burden shift to the Commissioner to prove the existence of alternative substantial gainful work in significant numbers in the national economy which claimant can perform, considering his or her physical and mental capabilities, age, education, experience and training. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).

Plaintiff maintains that the final decision of the Commissioner should be reversed for the following reasons: the decision was against the weight of the substantial evidence, was arbitrary

and capricious, and was an error of law; or, alternatively, for remand for a new hearing based on new and material evidence that should be considered by the Commissioner. ECF No. 15. Specifically, Plaintiff contends that in arriving at his determination, the ALJ considered stale medical opinion evidence which could not form the basis of substantial evidence, and the ALJ neglected to request a treating source statement, as required by the principles of *Tankisi v. Commissioner of Social Security*, 521 F. App'x 29 (2d Cir. 2013). ECF No. 15-1. I disagree, and find that the Commissioner's determination should be affirmed.

### D. The ALJ's Decision

The ALJ followed the sequential five-step analysis for evaluating Plaintiff's claim of disability (20 C.F.R. §§ 404.1520(a) and 416.920(a)). R. 25-36. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 31, 2011, the alleged onset date (20 C.F.R. §§ 404.1571 *et seq* and 416.971 *et seq*). R. 27. At step two, he found that Plaintiff had the following severe impairments: left wrist pain, schizoaffective disorder, major depressive disorder, and post-traumatic stress disorder ("PTSD") (20 C.F.R. §§ 404.1520(c) and 416.920(c)). R. 28. At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). R. 28-29. The ALJ, after careful consideration of the entire record, at step four, concluded that Plaintiff had the residual functional capacity to perform the full range of light work[3] as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except only

---

[3] As defined in 20 C.F.R. § 416.967(b),

    light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking, standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we

occasional pushing and pulling with the left dominant hand; occasional handling and fingering with the left dominant hand; limited to simple, routine, repetitive tasks; and occasional interaction with the general public and coworkers. R. 29-32. Also at step four, the ALJ found that Plaintiff was unable to perform any past relevant work. R. 32. Considering Plaintiff's age, education, work experience, and residual functional capacity, at step five, the ALJ found that there were jobs existing in significant numbers in the national economy that Plaintiff could perform, specifically, housekeeper, sorter, and mail clerk. R. 32-33. Accordingly, he concluded that Plaintiff had not been under a disability, as defined in § 1614(a)(3)(A) of the SSA, from August 31, 2011 through the date of his decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)). R. 34.

### E.  The Commissioner Applied the Correct Legal Standards

First, there is no doubt that the Commissioner applied the correct legal standards by engaging in the SSA-created, five-step sequential evaluation process outlined in 20 C.F.R. §§ 404.1520(a) and 416.920(a). I disagree with Plaintiff's assertion that the ALJ failed to properly develop the record by seeking an updated medical opinion. Substantial evidence supported the Commissioner's decision.

### F.  The ALJ Committed No Error by Failing to Develop the Record

Plaintiff seeks remand for further development of the record, arguing that the ALJ did not seek an updated medical opinion, or treating source following her first psychotic episode. She contends that the state agency consulting opinions were rendered stale by Plaintiff's first psychotic episode, thereby, making the need for a treating source statement all the more compelling.

---

determine that he or she can do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

Without question, the treating physician rule provides that an ALJ should defer "to the views of the treating physician who has engaged in the primary treatment of the claimant." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003); 20 C.F.R. § 404.1527(c)(2); SSR 96-2P; *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). A treating physician's opinion as to the nature and severity of a claimant's impairment is given controlling weight by the Commissioner, if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2); SSR 96-2p; *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). However, "[a] treating physician's statement that the claimant is disabled cannot itself be determinative." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

As Plaintiff correctly observes, social security hearings are not, or at least are not meant to be, adversarial in nature. *Lamay v. Commissioner of Social Security*, 562 F.3d 503, 508 (2d Cir. 2009). "[I]t is the rule in our circuit that the [social security] ALJ, unlike a judge in a trial, must [on behalf of all claimants] ... affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Id.* at 508-509 (quoting *Tejada v. Apfel,* 167 F.3d 770, 774 (2d Cir.1999)) (internal quotation marks omitted). To be sure, where there are deficiencies in the record, the regulations place an affirmative duty upon the ALJ to develop a claimant's medical history in the administrative record, even where the claimant is represented by counsel. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.") (citing *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996)) ("An ALJ is under an affirmative obligation to develop a claimant's medical history, 'even when the claimant is represented by counsel ..."); *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) ("It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must [her]self affirmatively develop the record' in light of 'the

essentially non-adversarial nature of a benefits proceeding.'  This duty ... exists even when ... the claimant is represented by counsel.") (citations omitted) (alterations in the original).

In view of the extensive evidentiary record, I am un-persuaded by Plaintiff's arguments that the ALJ erred in failing to develop the administrative record further by obtaining an updated medical opinion following Plaintiff's alleged "first psychotic episode."  Here, the medical record contained not just the consistent opinions of the consultative examiners, but numerous references by treating sources at Westside and Unity regarding Plaintiff's stability on medication, her GAF scores of 55, as well as her own consistently reported daily living activities and personal testimony regarding stability on medication, caretaking of her son and tending to her home, all following hospitalization.  Indeed, by Plaintiff's own account and reports to RGH ED staff at the time of her admission, she had stopped taking her medication.  Furthermore, Plaintiff, herself sought to minimize or downplay the overall significance of being admitted to RGH by explaining to her Unity counselor how the situation which prompted her hospitalization differed from the CPS/police version.  The medical evidence in the record reflected sufficient information about Plaintiff's hospitalization at RGH, information which was considered and incorporated in the diagnoses and mental health evaluations, and treatment plans arrived in consultation with Plaintiff.  Additionally, the ALJ had the benefit of treatment notes from both Westside and Unity which demonstrated how Plaintiff's mental health needs were being addressed since her RGH admission.  As a whole, then, this evidence belies any argument that the opinions of Dr. Finnity and Dr. Nobel were rendered stale by Plaintiff's hospitalization such that their conclusions were unreliable or unworthy of consideration in the determination of the RFC and the finding of "not disabled."

Nor, am I convinced, in the circumstances of this case, on the evidentiary record presented, that the Second Circuit's decision in *Tankisi* requires remand on the strength of

Plaintiff's sole argument that the ALJ erred by not seeking an additional treating source following Plaintiff's alleged "first psychotic break." The Second Circuit made clear in *Tankisi* that, based on the text of the relevant provisions, 20 C.F.R. §§ 404.1513(b)(6) and 416.913(b)(6), there is no *per se* error for an ALJ to render a disability determination without getting a medical source statement from a treating physician, particularly where the record contains sufficient evidence from which the ALJ can assess the [plaintiff's] residual functional capacity. *Tankisi,* 521 F. App'x at 33-34. ("'Medical reports *should* include … [a] statement about what you can still do despite your impairment,' not that they must include such statements"; "the lack of the medical source statement will not make the report incomplete."). To the extent that Plaintiff's relies on *Tankisi* as standing for the proposition that the ALJ was mandated to do so, such reliance is misplaced.

Here, the ALJ had the benefit of the treatment notes of Plaintiff's primary care providers and mental health treatment providers. *See, e.g., Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (finding that the ALJ who had all of the treatment notes had no further obligation to supplement the record by obtaining a medical source statement from a treating physician). Moreover, the Court takes serious note of the fact that, here, the ALJ held the record open for additional evidence to supplement the medical record, and such evidence was received, entered into the record, and considered in the disability determination.

### G.  Substantial Evidence Supported the Commissioner's Decision

Plaintiff's claims notwithstanding, upon review, I find that the ALJ based his decision that the Plaintiff was not disabled upon a record which contained substantial evidence to support the decision.

The ALJ determined that considered singly or in combination, Plaintiff's physical impairment, severe left wrist pain, did not meet or medically equal the criteria of the relevant

listings. R. 28.  In determining that Plaintiff's severe mental impairments, singly or in combination, did not meet or medically equal the criteria of listings 12.03, 12.04, and 12.06, the ALJ evaluated them according to the criteria set forth in "paragraphs B and C."  R. 28-29.  As the ALJ stated, to satisfy "paragraph B," the mental impairment must result in two of the following: marked restriction of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration, and noted that marked limitation means more than moderate but less than extreme, and repeated episodes of decompensation, each of extended duration means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.  R. 28.

Using these "paragraph B" criteria to evaluate the record regarding Plaintiff's mental impairments, the ALJ found that Plaintiff had mild restriction in daily living activities: she was able to dress, bathe, groom herself, cook, clean, and do laundry; she cared for her 9-year-old son, did household chores and shopped for groceries, but had difficulty with laundry sometimes.  *Id.* Citing her moderate difficulties in social functioning, the ALJ stated that Plaintiff did not socialize with friends; had poor relationship with her family; experienced deepened depression because she was not as energetic as her friends; but testified to attending her son's school events and going to church almost every Sunday.  *Id.*  The ALJ found moderate difficulties regarding concentration, persistence, or pace, specifically stating the following: Plaintiff enjoyed reading, indicating an ability to concentrate; she had average cognitive functioning, but her recent and remote memory were "mildly impaired"; according to her testimony, the nightmares she sometimes experienced affected her.  *Id.*  The ALJ found that Plaintiff had experienced no episodes of decompensation which had been of extended duration.  *Id.*  Reasoning that Plaintiff's mental impairments did not cause at least two "marked" limitations or one "marked" limitation

and "repeated" episodes of decompensation, each of extended duration, the ALJ concluded that the criteria in "paragraph B" had not been met.  R. 28-29.

In concluding that "paragraph C" had not been met either, the ALJ determined that the record failed to show evidence of a chronic schizoaffective, paranoid, or other psychotic disorder, or chronic affective disorder of at least two years duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychological support causing Plaintiff to suffer an episode of decompensation with a minimal increase in mental demands, or inability to function outside a highly supportive living arrangement or outside the area of her home.  R. 29.

The ALJ, next, undertook a Residual Functional Capacity ("RFC") assessment pursuant to SSR 96-8p.  Analyzing the entire record, including Plaintiff's symptoms and the extent to which they were reasonably consistent with the objective medical and other evidence, and the opinion evidence,  the ALJ determined that Plaintiff had an RFC to perform the full range of light work, but with the following limitations: only occasional pushing and pulling with dominant left hand, occasional handling and fingering with the dominant left hand, work requiring only simple, routine, repetitive tasks, and occasional interaction with co-workers, as well as the general public.  R. 29-32.

Social Security regulations require Administrative Law Judges to follow a two-step process for evaluating pain and other limiting effects of symptoms.  20 C.F.R. §§ 404.1529(a), 416.929(c)(3).  First, the ALJ must determine whether the objective medical evidence, *i.e.*, medical signs and laboratory findings, and other evidence shows that a claimant suffers from a medically determinable impairment which could reasonably be expected to produce the claimant's symptoms.  If the claimant does suffer from an impairment(s), the ALJ must then

evaluate the intensity, persistence, or limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to work.

When doing do, the ALJ must consider all of the available evidence, including the claimant's medical history, medical signs and laboratory findings, and statements from the claimant, the claimant's treating source and other medical opinions, or other persons about how the symptoms affect the claimant. *Id.* If a claimant's statements about his or her symptoms are not supported by the objective medical evidence, the ALJ must consider the other evidence and make a credibility assessment based upon the following factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment to relieve symptoms; (6) any measures taken by claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The ALJ's decision must set forth "specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the [claimant] and to any subsequent reviewers the weight the [ALJ] gave to the [claimant's] statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). It is the role of the Commissioner, not the reviewing court, "to resolve evidentiary conflicts and to appraise the credibility of the witnesses," including with regard to the severity of a claimant's symptoms. *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). No grounds for remand exist where "the evidence of record permits [a court] to glean the rationale for the ALJ's decision." *Monguer v. Heckler*, 722 F.3d 1033, 1040 (2d Cir. 1983).

Here, the ALJ considered Plaintiff's testimony that: she could not work because of left hand pain, depression resulting from these hand issues, and PTSD; she recently started taking

prescription medication for her hand, but had taken Advil in the past; she had been wearing a brace on her left wrist and could not lift more than 5 or 10 pounds with her left hand, but could probably lift more weight with her right hand; she attends counseling and takes psychotropic medications which help enough to enable her to take care of her son. R. 30. After considering all the evidence, the ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but did not credit her testimony regarding the intensity, persistence, and limiting effects of the symptoms to the extent they were inconsistent with RFC. R. 29-30.

In terms of her left wrist pain, the ALJ considered that Plaintiff sought physical therapy in early 2010 at Southview with assessed loss of strength, decreased function, thenar atrophy of the left hand and pain limiting function; Dr. Rosenfeld's orthopedic examination report noted left hand grip strength of 4/5, right hand grip strength of 5/5, and full range of motion of the wrist; left hand grip strength in February 2011 of 3/5 and referral to a neurologist; no evidence in the record of neurology visits, but, electrodiagnostic testing of the left wrist on [May 17, 2011] revealed evidence of median neuropathy with complete denervation of the left abducto-pollici brevis, but no evidence of left ulnar neuropathy. R. 30-31. I concur with the ALJ's determination that, consistent with these objective signs and symptoms, the RFC, by limiting Plaintiff to light exertional work with only occasional pushing and pulling with the dominant left hand, occasional handling and fingering with the dominant left hand, accommodated any limitations that Plaintiff's left wrist pain may cause.

Concerning Plaintiff's mental impairments, the ALJ considered the following: Plaintiff sought mental health treatment in September 2010 at Westside where she received diagnoses including PTSD and was prescribed Sertraline; the medication proved less than helpful and Plaintiff was diagnosed on September 8, 2010 with atypical depressive disorder and Lamotrigine

was prescribed, with a plan for counseling; in December 2010, Plaintiff underwent an initial

mental health examination at Unity which revealed anxious and depressed mood and congruent

affect, with resultant diagnoses of PTSD, major depressive disorder, recurrent, severe with

psychotic features, anxiety disorder; a 16-month gap in Plaintiff's mental health treatment until

she underwent another mental health evaluation in April 2012 whereby she received diagnoses

including psychotic disorder (suspect schizoaffective disorder) and major depressive disorder,

recurrent, moderate severity, was assessed a GAF score of 55 (moderate impairment in social

functioning) and was prescribed Abilify; other mental health records from 2012 noted the

schizoaffective disorder, but also took note of Plaintiff's apparent stability and GAF score of 50

(borderline moderate impairment in social functioning).  I agree that the ALJ's assessed RFC

was consistent with these objective signs and findings in the medical record, in that it limited

Plaintiff to light work requiring only simple, routine, repetitive tasks, occasional interaction with

co-workers, as well as the general public to accommodate any limitations that her mental

impairments may cause.

Turning to the opinion evidence, the ALJ afforded great weight to the conclusions of the

Dr. Rosenfeld, consultative orthopedic examiner; Dr. Nobel, state agency psychological

consultant; and Dr. Finnity, psychological consultative examiner, finding their opinions to be

generally consistent with the objective signs and findings in the medical record.  R. 31-32.

Specifically, he found that Dr. Rosenfeld's conclusions that Plaintiff had a mild-to-moderate

restriction in lifting and carrying with her left arm, as well as reaching with her left arm, due to

left wrist involvement and pain in the left arm to be generally consistent with objective signs and

findings in the medical record, which showed diminished grip strength with the left wrist and

abnormalities revealed by electrodiagnostic testing.  The RFC determination, according to the

ALJ, accommodated Dr. Rosenfeld's opinion in its limitation to light exertional work with only

occasional pushing and pulling with the dominant left hand, and occasional handling and fingering with the dominant left hand. R. 31.

The ALJ found Dr. Nobel's conclusions that Plaintiff retained the ability to perform entry-level work with limited contact with people to be generally consistent with the objective signs and findings in the medical record, which indicated a depressed and anxious mood and congruent affect, but stability when taking medication. R. 32. The limitation of the RFC to only simple, routine, repetitive tasks, and occasional interaction with the general public, accommodated Dr. Nobel's opinion, in the ALJ's assessment. *Id.*

Likewise, the ALJ found Dr. Finnity's conclusions regarding Plaintiff's ability to follow simple directions, perform simple tasks, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks with supervision, make appropriate decisions, as well as her difficulty relating to others and dealing with stress, to be generally consistent with the objective signs and findings in the medical record, which indicated a depressed and anxious mood and congruent affect, but stability when taking medication. Dr. Finnity's opinion, likewise, was accommodated in the RFC by limiting Plaintiff to only simple, routine, repetitive tasks, and occasional interaction with the general public. *Id.*

The opinion of a consultative examiner can constitute substantial evidence supporting an ALJ's decision. *See Diaz v. Shalala*, 59 F.3d 307, 315 (2d Cir. 1995). The report of a consultative physician who examines the plaintiff and reaches conclusions based upon a one-time examination may constitute substantial evidence in support of the ALJ's decision. *Monguer v. Heckler*, 722 F.3d at 1039. Moreover, pursuant to SSR 96-6p, the ALJ was entitled to consider the "expert opinion evidence of non-examining sources."

The ALJ made the astute observation that a finding of "not disabled" would be directed by Medical-Vocational Rule 201.21, if Plaintiff had the RFC to perform the full range of light

work. R.33. But, because he found that Plaintiff had no past relevant work, and her ability to perform all or substantially all of the requirements of the full range of light work had been impeded by additional limitations, and in order to determine the extent to which such limitations "erode[d] the unskilled occupational base," the ALJ considered the VE's testimony regarding the existence of jobs in the national economy for a hypothetical person with Plaintiff's age, education, work experience, and residual functional capacity. *Id.* Based upon the VE's testimony that a significant number of jobs existed in the national economy for an individual presenting with Plaintiff's factors, the ALJ concluded that Plaintiff was capable of making a successful adjustment to other work existing in significant numbers in the national economy and, consequently, a finding of disabled was not appropriate. *Id.*

Based upon the specific reasons offered by the ALJ for his finding on credibility, and wealth of supportive evidence in the record, I conclude that the ALJ ably resolved the evidentiary conflicts and reasonably appraised the credibility of the witnesses. Consequently, I agree that the medical evidence of record which demonstrated instances of Plaintiff's non-compliance with medical treatment, inconsistencies in Plaintiff's testimony and reports to providers related to when she last worked, as compared to work activity reports and earnings records which showed earnings in 2010 and 2011, after the initial onset date, inconsistencies in the amount of contact Plaintiff had with people, and conflicting information regarding alcohol use, amply supports his credibility assessments. R. 31.

Therefore, for the reasons set forth herein above, the Court rejects Plaintiff's arguments for reversal of the Commissioner's decision denying Plaintiff DIB and SSI because she was not disabled since August 31, 2011.

## IV.    CONCLUSION

For all of the foregoing reasons, and after careful consideration of the entire record, I find that the Commissioner's determination was supported by substantial evidence in the record and was not erroneous as a matter of law for failure of the ALJ to supplement the hearing record. Accordingly, the Commissioner's determination is affirmed.    The Court hereby DENIES Plaintiff's Motion for Judgment on the Pleadings (ECF No. 15), and GRANTS Defendant's Motion for Judgment on the Pleadings (ECF No. 16). The Court orders that Plaintiff's Complaint (ECF No. 1) be dismissed, and the Clerk of the Court is directed to close Civil Case No. 13-CV-6258.

IT IS SO ORDERED.

Dated: March 25, 2015
       Rochester, New York

HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court